WILLIAM P. CANNON & others *vs.* SAMUEL E. HARE & others.

October Term, 1872.

DOWER ESTATE, BUILDINGS ERECTED THEREON, DURING THE TENANCY BY DOWER, PASS TO REMAINDER-MEN, WHEN.—Buildings erected on a dower estate by the dowress, or person claiming under her, if designed as additions to the freehold or to enhance its convenience or income, pass, on the death of the tenant for life, to the remainder-men.

FIXTURES AND IMPROVEMENTS, HOW RIGHT TO DETERMINED.—The tendency of modern decisions is to make the rights of the parties to fixtures and buildings depend, not on the manner in which they are attached to the freehold, but upon the relation of the parties, the intention in erecting the improvements, and the uses to which they are put.

TENANT FOR LIFE, RIGHT OF HIS REPRESENTATIVE TO FIXTURES, ETC.—Consequently, a tenant for life, or his representative, is not entitled to remove buildings of a permanent character erected during the life estate, and permanency may be predicated of all buildings which appear, either by the intention of the party erecting them, the manner of attachment to the soil, or the uses to which they are put, to have been designed as additions to the freehold, or to enhance its convenience or income.

CASE IN JUDGMENT.—The lessee of a dowress erected on a city lot a row of buildings framed in the shop, each part marked for its particular position, and

raised without framing, on a brick foundation-wall, with brick chimneys and composition roof entire, and rented the lower rooms for stores, and the upper for bed-rooms. *Held*, that these buildings passed, on the death of the dowress, to the remainder-men, and that the lessee was neither entitled to remove them, nor to compensation for their value.

*Ed. Baxter*, for complainants.

*H. H. Harrison*, for defendants.

THE CHANCELLOR :—No exception has been taken in this case to the form of the proceedings, and I presume it is the wish of all parties that their rights to the property in dispute should be determined without reference to the mode in which the litigation is presented. The question upon which their rights turn, is, whether the lessee of a tenant in dower, and those claiming under him, are entitled to certain buildings erected during the life of the dowress on the dower land, and standing thereon at her death, or whether the buildings go with the land to the persons entitled in remainder. In other words, the controversy involves the relative rights of the tenant for life and the remainder-man of land, to buildings erected on the land during the life estate.

The dower land on which these buildings were erected, consists of a lot in the city of Nashville, fronting 92 feet on Spring street and running back 60 and one-half feet, and was vacant and unimproved at the time of the assignment in dower, and also when leased by the dowress. The adjoining lot, which was conterminous with the dower land on two sides, was owned by Robert Martin, who had erected thereon a large building, known as the St. Cloud Hotel, and used as a hotel. On the 17th of September, 1859, the dowress leased the dower lot to the said Martin, during her life, for an annual rent of $25, and payment of taxes. Martin leased the hotel lot and the dower land to Stevenson and Alloway, who sold and conveyed this leasehold interest in both lots to persons under whom George F. Case claims. In the year 1865, the said Case, who was then using the St. Cloud building as a hotel, and exercising on the hotel lot the vocation of a tavern-keeper, erected the houses in dispute.

These houses cover about 91 feet front on Spring street of the dower lot, and about 20 feet of the hotel lot immediately adjoining, and have a depth of about 33 feet, being partly one story, and partly two stories high. On the 29th of December, 1866, Case sold and conveyed these buildings by instrument of writing, to H. M. Smith, and shortly afterwards several of the creditors of Case filed bills in this court, attaching the interest of Case in these buildings and in the hotel property, and attacking the conveyance to Smith as fraudulent. In the month of January, 1867, the tenant in dower died, and in February thereafter the remaindermen filed their petition in these causes, claiming the buildings on the dower land as part of the realty. The petition states briefly, that the dowress leased the land to certain tenants, "who erected permanent houses and other fixtures thereon," which thereby became part of the freehold. The only answer filed to this petition is by H. M. Smith, who sets up and relies on the conveyance of Case of the 29th December, 1866, on the fact that the buildings are portable, as hereinafter explained, and then says: "The said George F. Case was, at the time of putting up said houses, engaged in the business of carrying on the St. Cloud Hotel, and had the said buildings placed on said lot in connection with said hotel and the business thereof, and for the purpose of extending and carrying on said business." There is, however, no direct evidence in the record, of the intention of Case in erecting these buildings, either as to the permanent nature of the improvements, or the uses to which the improvements were to be put. The court is left to infer the intention from the character of the buildings, and the actual uses to which the buildings were put only appears from the statements of the witnesses that, at the time their depositions were taken, "the buildings contained a billiard saloon, part of a barber shop (the other part being in same building but on hotel lot), and a store, the store occupying the space formerly divided into three rooms."

The buildings are described by the witnesses as what are

known as portable buildings, that is, they are framed in the shop, each part being marked for its particular position, and raised and finished without further framing. Such houses can be made more or less substantial, and are capable of being taken down and removed at pleasure, and rebuilt. These particular buildings are, however, constructed with somewhat more than usual care, having a brick foundation wall in front, and brick chimneys. The roof on each story is single and entire, not divided into sections, and is formed of composition. The front of the building is in panels, the rear is ceiling-plank nailed up and down, and the ceiling inside is plastered. The buildings rest upon a plate, which lies upon the brick foundation wall, and forms the bottom sill. The up stairs was cut up into bedrooms, separated from each other by plank partitions, secured with strips at top and bottom, and nailed in the ordinary way in which partitions are made in permanent, fixed buildings. The weight of testimony is, that these buildings could, apparently, be removed without injury to the foundation, and certainly without injury to the ground upon which they stand; but, in order to their removal, they would have to be taken down and torn to pieces, with great injury to papering, plastering, etc.

The law of fixtures, particularly in the form of actual buildings, seems to be in a distressing state of uncertainty, partly from the vast variety of forms in which the improvements may be made, and partly from the different application of the same rules between parties standing in different relations to each other. Still, with the aid of the arguments which have been submitted by the learned counsel, I think I have found a clue to the labyrinth, sufficient to guide me to a conclusion satisfactory to my own mind, in this case.

All the authorities agree, in the language of our own supreme court, that " it is a well established rule of the common law, that anything affixed to the freehold passes with the freehold, and the rigor of the rule is only relaxed in exceptional cases." *Childress* v. *Wright*, 2 Cold. 350;

*De Graffenreid* v. *Scruggs*, 4 Hum. 454. It is equally agreed on all hands, that the exceptions to the rule are most restricted as between executor and heir ; have a wider, though "limited range," between tenant for life and remainder-man, who stand in independent attitudes ; and are most liberally allowed,.as between landlord and tenant for years. 2 Smith's Lead. C. 256. The difficulty is in ascertaining the limits of the range of exception as between the parties standing in the attitude of those now before the court. For, between executor and heir, the general rule retains its utmost rigor, while between landlord and tenant, the exception is most latitudinarian in favor of the tenant. The doubt is as to the intermediate parties. It will be the easiest course to see, first, how far the exceptions have gone in favor of tenant for years.

And, certainly, the relaxation of the general rule as between these parties, has been carried very far. The learned American editor of Smith's Leading Cases, in his notes to *Elwes* v. *Mawe*, 3 East (2 Sm. L. C. 259), thus sums up the law : "The privilege of the tenant seems, at one time, to have been limited to fixtures erected for the benefit of trade, but it now embraces additions to the freehold made for ornament, pleasure or convenience, and may extend to structures, or even buildings of a durable and substantial kind, if so constructed that they can be taken away without serious or irreparable injury to themselves, or the premises of which they form a part. *Van Ness* v. *Pacard*, 2 Pet. 143 ; *Grymes* v. *Bowen*, 6 Bing. 437 ; *Marston* v. *Roe*, 2 E. & Bl. 257 ; *Ombony* v. *Jones*, 19 N. Y. 234." * * "The limits of the rule are, however," he adds, "obscure and ill-defined, and it would seem not to apply to any edifice which is so constructed as to justify the belief that it is meant to be a permanent addition to the freehold, or that cannot be removed in such a condition as to be fit for use elsewhere ;" citing *Kutter* v. *Smith*, 2 Wall. 491 ; *Reed* v. *Keith*, 12 Rich. 54 ; 11 Ohio St. 482. On the preceding page (p. 258) the same learned editor has this paragraph : "And the deci-

sions will, perhaps, fully establish that every addition or improvement made by a tenant, which can be severed without placing the freehold in a worse condition than it was when the term began, may be removed at or before its termination, without regard to the cause or motive of the erection." But, he again adds: "A different view was, however, taken in *Reed* v. *Keith*, 12 Rich. 54; and in *Ombony* v. *Jones*, 19 N. Y. 234, 240, the general rule under which everything that is affixed to the freehold becomes part of it, was said to prevail, even between landlord and tenant, except where the circumstances are such as to create an exception, and to preclude the removal of outhouses or buildings erected during the continuance of the lease, although resting on pillars or tressels, and not let into the soil, unless they were built for the furtherance of the trade or business of the lessee, *and not merely with the view of adding to the yearly value or income from the land by being leased or used for dwellings.*"

It will be seen that the learned editor, while laying down the law most favorably for the tenant, and showing that the tendency of modern decisions is to still greater latitude, concedes that the actual decisions have not yet gone to the extent claimed. Mr. Washburn, in his work on Real Property, p. 114, obviously confines the exception in favor of tenants within more moderate limits. "A structure," he says, " erected by tenant for years, of whatever size or material it may be, may be removed, though (*sic*, but he means "if" or "whether it be") erected and used for purposes of agriculture or manufacture." And one of the cases cited by him, *McCullough* v. *Irvine's Exr.* 13 Pa. St. 438, and which is not referred to by the editor of Sm. L. C., is so much to the point, that I beg leave to make from the opinion of the court the following quotation : "A two-story brick house and a large brick barn—the buildings in controversy—are not instruments or implements of any trade. They are great conveniences, which enable men of all sorts to enjoy the fruits of their labor or trade. If you make

these an exception, the rule itself is obliterated, and nothing is essentially of the realty, except the earth itself, and that which is in its bowels. The exceptions have been carried very far by some decisions of the eastern states, particularly in *Whitney* v. *Bartow*, 4 Pick. 310 ; *Holmes* v. *Tremper*, 20 Johns. 29, and *Van Ness* v. *Pacard*, 2 Pet. 143. It is, however, in somewhat loose expressions of the court in these cases, and not from the cases themselves, that the principle asserted derives some countenance. The first, where the dicta are the most latitudinarian, was merely the removal of a padlock and some loose boards, about which there never could have been any reasonable doubt. The second was the removal of a cider-press by the tenant, and there, no reasonable doubt of its being an implement for the manufacture of cider could be entertained. The last case runs to a little more magnitude, for it was removing a sort of a house, but a house erected for the manufacturing of a commodity ; and the decision goes expressly upon the ground of its not being a dwelling house. None of these cases, either expressly or by implication, overrule *Elwes* v. *Mawe*, 3 East, in which it was held that an agricultural tenant could not remove, during the continuance of the lease, a beast house, carpenter shop and fuel house, erected for the use of the farm, even though he left the premises as he found them."

I have myself examined all the cases referred to by the text writers, on which I could lay my hands, bearing directly upon the right of a tenant for years to remove buildings erected by him during the term. I find one class of cases like *Wansborough* v. *Maton*, 4 A. & E. 884, and *Clemence* v. *Steere*, 1 R. I. 272, where the structure in controversy was held to be not a fixture, but a chattel, such as a small out-building, resting on the soil by its own weight, and the decisions appear to be based upon that ground alone. I find another class making the exception to the general rule turn upon the fact that the buildings were put up for the purpose of trade or manufacture, *or principally for these purposes*. This class of cases has been extended to various occupations

having an affinity or resemblance to trade, although hardly included in the general definitions of that term. The two strongest cases in this class, which I have found, are *Van Ness* v. *Pacard*, 2 Pet. 143, and *Ombony* v. *Jones*, 19 N. Y. 234. The first of these was the case of a building erected on a lot in Washington City, on the foundation of a stone cellar, with brick chimney, used as a dwelling for the tenant, and for the manufacture of butter. The decision was placed upon the ground that the erection was made principally for the purpose of trade, and it was expressly conceded by the court, that, "if the house were built *principally* for a dwelling for a family, independently of carrying on the trade, then it would doubtless be deemed a fixture, falling under the general rule, and immovable." The case of *Ombony* v. *Jones* was that of a tavern-keeper at a summer resort, who erected a large ball-room on stone piers sunk in the ground, and the decision was placed on the principle that the building of a ball-room might be deemed in furtherance of the trade of a tavern-keeper. The analogy of this case to the one before us, is obvious. I can find no direct decision which sanctions the idea, that even a tenant for years can remove buildings erected for his personal accommodation as a dwelling, or for the purpose of yielding an income by being rented. *Van Ness* v. *Pacard* is directly in point against the right of removal of a house erected *principally* for a dwelling. And Chancellor Walworth intimates in *Winship* v. *Pitts*, 3 Paige, 289, that a lessee for years would not be entitled, without the permission of his landlord, to remove a building erected during the term, where it was not erected for the purpose of trade, and so as to be removed without affecting the freehold. It was also admitted in the argument for the tenant, in the leading case of *Elwes* v. *Mawe*, "that not even persons renting premises for the purpose of carrying on a trade—much less ordinary lessees— have any privilege to remove permanent additions and improvements made by a tenant, to the old dwelling house or outbuilding, *or even new ones of that sort erected by him for*

*his personal accommodation.*''   Mr. Washburn limits, also, as
we have already seen, the removal of buildings to those
erected for the purpose of agriculture or trade, where they
are attached to the freehold.   And the learned editor of the
American Notes, in Sm. L. C., on the page already cited,
says that even *Ombony* v. *Jones* admits that the tenant can-
not remove '' outhouses, although resting on pillars or tres-
tles, and not let into the soil, unless they were built for the
furtherance of the trade or business of the lessee, and not
merely with a view of adding to the yearly value or income
from the land by being leased or used as dwellings.''   These
limitations strike me as offering a plain and practical rule of
discrimination between buildings which the tenant may re-
move, and those which he may not.   Unless we make some
such distinction, the general rule of the common law, with
which we started out, is, in the language of the Supreme
Court of Pennsylvania, already quoted, ''obliterated, and
nothing is essentially of the realty except the earth itself,
and that which is in its bowels.''   The finest framed or other
buildings, to use the words of the witnesses in the case now be-
before us, are constructed upon foundation walls ; and any
building can be taken down to the top of the foundation walls,
and they might have added, to the bottom rock of the founda-
tion walls, without injury to the soil.   Accordingly, the tend-
ency of modern decisions is to make the rights of the parties
to fixtures and buildings depend, not on the manner in which
they are attached to the freehold, but upon the character of
the parties, the intention in erecting the improvements, and
the uses to which they are put.   Loose machinery in a man-
ufacturing establishment will, as we shall see presently, go
to the heir as against the executor, while the same machinery
firmly attached to the building, and even the building itself,
belong to the tenant for years as between him and his land-
lord.   So, substantial houses built upon stone foundations,
with brick chimneys, and indubitably attached to the soil,
will, if erected principally for purposes of trade, belong to
the outgoing tenant for years ; while the same buildings, or

even buildings resting upon pillars or trestles, and not let into the soil, if erected and used as dwellings, or for the more convenient enjoyment of the land, or for the purpose of obtaining an income by renting, would go, with the free-hold, to the landlord, even as against the tenant for years.

Let us now see whether the exceptions as to the general rule, made in favor of the tenant for years, apply to the tenant for life. We know that these exceptions, so far at any rate as they relate to buildings and fixtures for purposes of trade, do not exist in favor of the executor against the heir. This was decided in *Fisher* v. *Dixon*, 12 Cl. & F. 312,* upon elaborate argument, by the House of Lords, the law lords, Brougham, Cottenham and Campbell, all concur-ring. This is also the recognized doctrine in this country. *House* v. *House*, 10 Paige, 158 ; 11 Barb. 43. But how is it as between tenant for life and remainder-man? Mr. Smith, in his note to *Elwes* v. *Mawe*, 3 East, 38—2 Sm. L. C. 245 —says : "The indulgence extended to the executors and administrators of tenants for life or in tail, is not so great as that granted in the case of landlord and tenant." But he adds, after citing *Lawton* v. *Lawton*, 3 Atk. 13, and *Dudley* v. *Ward*, Amb. 113, as belonging to this class, that these cases, coupled with the observations of Lord Mansfield in *Lawton* v. *Salmon*, 1 H. Bl. 260, and the L. C. J. in the principal case, show that the representative of the particular tenant—tenant for life—is entitled, as against the remainder-man, to fixtures erected wholly or in part for the furtherance of trade. The cases of *Lawton* v. *Lawton* and *Dudley* v. *Ward*, were both cases of a fire-engine to work a colliery, and the decisions were in favor of the representative of the

---

* NOTE—It is in this case that Lord Campbell, in delivering his opinion, draws a happy illustration of the law of fixtures in discussing the famous cider-mill case, decided by Lord Chief Baron Comyns, and cited in *Lawton* v. *Lawton*, from the Vicar of Wakefield. "We know," he says, "that a cider-mill is not necessarily affixed to the freehold, a familiar instance of which is given in the Vicar of Wakefield, where, when a match was proposed between one of the Misses Primrose and young farmer Flamstead, Moses said, 'I hope that if my sister marries young farmer Flamstead, he will lend us his cider-mill.'"

tenant for life, mainly on the ground, according to Lord Ellenborough in the principal case, "that where the fixed instrument, engine, or utensil (and the building covering the same falls within the principle), was an accessory to a matter of a personal nature, that it should be itself considered as personalty." Lord Hardwicke, in *Lawton* v. *Lawton*, thought the case of tenant for life came nearer to that of a common tenant, and he finally decided in favor of the executor of such tenant, principally to encourage trade for public benefit.

The American editor of Sm. L. C., 2 Sm. 256, says that "the rule (of exception in favor of tenant) has a wider, though limited range, between tenant for life and those in remainder;" citing *Martin* v. *Roe*, 40 Eng. L. & Eq. 68 ; *Buckley* v. *Buckley*, 11 *Barb*. 43 ; *White* v. *Arndt*, 1 Whart. 91 ; *Doak* v. *Wiswell*, 38 Maine, 569 ; *Wilde* v. *Waters*, 32 Eng. L. & Eq. 422 ; *Harkness* v. *Sears*, 26 Ala. 403. But these cases, while recognizing the rule as laid down, throw little light upon the limit of its range. The only one of them in which I can find any attempt at definition, is *Buckley* v. *Buckley*. There, the learned judge, in the course of his opinion, says : " As between tenant for life and remainder-man or reversioner, the rule in favor of the realty is, as we have seen, somewhat relaxed. And I am inclined to think that a tenant for life, who erects a fixture for the purpose of trade or manufacture, has an equal right, in respect to their removal, with a tenant for years (Law of Fixtures, 117), though the cases have, perhaps, not generally gone so far." In *Martin* v. *Roe*, which was an action to recover the frames and glass-work of a hot-house, brought by the personal representative of a deceased rector against the new incumbent, the counsel for the plaintiff admitted that, "as between remainder-man and tenant for life, the structure might be considered so fixed as to pass with the freehold;" but insisted that the relations between a former and succeeding incumbent, who were both tenants for life, were different; and so the court held. In *Doak* v. *Wiswell*, the husband of a dowress was

not permitted to recover a "dwelling-house and detached barn," erected by him during the life of his wife, upon substantially the same ground assumed by our own court in *Marable* v. *Jordan*, 5 Hum. 417.

Mr. Washburn, in the few sentences devoted to this subject in his work on real property (1 Wash. 114), is not a whit more satisfactory. "And it would seem," he says, "that a somewhat different rule applies in cases of tenants for life from those for years." But all we can gather from his own remarks, and the substance of cases as cited by him, is, that a tenant for years may remove even permanent buildings erected for purposes of agriculture or trade, whereas a tenant for life may not remove "permanent improvements annexed to the freehold" by him; for which he cites *Austin* v. *Stevens*, 24 Maine, 520—a case I have not been able to lay my hands on, the volume in which it is contained having been taken from the state library. Mr. Washburn refers, however, in this connection, to the case of *McCullough* v. *Irvine's Exrs.*, 13 Pa. St. 438, from which I have already made an extract. And this is the only case I have found in which an attempt is made by the court to distinguish between the rights of tenants for life and tenant for years as to fixtures, and to give a reason for the distinction. Tenants for life are usually widows as dowresses, or husbands as tenants by curtesy, or devisees under wills with remainder to children or other blood relations. The persons entitled in remainder, in such cases, are ordinarily those nearest in ties of affection and blood to the tenants of the life estate. It may well be presumed, as between such parties, that improvements put upon the property by the life tenant, are not designed for the temporary use of such tenant, but as permanent ameliorations. It would be a poor encouragement to husbandry in the case of farms in the country, or of improvements of realty in cities, to allow the tenant for life, after erecting buildings and enjoying them for a quarter or half of a century, to remove them at the end of a long life, and leave the ground naked, but as valu-

3

able as he found it. "We must have many tenancies for life in Pennsylvania," say the court, "by will, by deed, or by descent; and if the tenant, after having enjoyed the fruit of the land during perhaps a long life, may, just before his death, strip it of the fences he has built, and the house and barn he has erected, because the advance in the improvement and commerce of the country would leave the land of as much intrinsic value as when he took possession, and convert it into a solitary waste for the winds to moan over, the tenant of a new generation would have to take the land as it was a generation before, and commence improving *de novo*."

These are cogent suggestions, and go very far to meet the able argument urged in this case, as to the hardship of compelling the tenant for life to erect improvements for the benefit of the inheritance. The absence of direct authority, too, in a matter of such every day occurrence, is also a powerful consideration in narrowing the exceptions to the general rule, so far as the tenant for life is concerned. And it gives some consistency to the uniform assertion of all textwriters and judges, that the exceptions are of more limited range as between tenant for life and remainder-man, than between tenant for years and landlord. I take it, therefore, that a tenant for life, or his representative, is not entitled to remove buildings of a *permanent* character, and that permanency may be predicated of all buildings which appear, either by the intention of the party erecting them, the manner of attachment to the soil, or the uses to which they are put, to have been designed as additions to the freehold, or to enhance its income or convenience. It is probable, also, that the exception in favor of buildings erected for purposes of trade, will be limited, in the case of tenant for life, to such as are erected exclusively for purposes of trade proper, and will not be extended to occupations having an affinity or resemblance to trade. In the absence of authority, however, this can only be considered as a suggestion. It is not necessary to go to this extent, nor to define the limits of the rule of exception in this case. For, when we come to apply

the principles of law which we have been discussing, to the case before us, we find that those claiming under the tenant for life, fail to bring themselves within any of the recognized exceptions. There is no pretence for saying that the buildings in dispute are mere chattels which might be recovered in an action of trover, upon the principle of the cases of *Wansborough* v. *Maton*, and *Clemence* v. *Steere*. They are fixtures, to which the representative of the tenant for life could have no claim, unless they fall within the exception in favor of trade. Now, we have seen, that this exception, even in favor of tenant for years, only applies where the buildings are erected principally in furtherance of trade, and does not apply where they are erected and used as dwellings, for the more convenient enjoyment of land, or for the purpose of adding to the yearly value or income by renting. We have also seen that there is no direct evidence of the intention with which these buildings were put up, nor the actual uses to which they were applied. These are left to inference. And, although the inference from the general character of the buildings might be that they were intended to be removable, yet the proof leaves it doubtful whether this intention could be carried out, owing to the mode of erection of these particular buildings, so as in the language of the editor of Sm. L. C., already quoted, that they could be taken away "without serious or irreparable injury to themselves, or the premises of which they form a part." And, on the other hand, the inference from the evidence in the record, in the absence of countervailing testimony, is that these buildings were erected, "*not for the furtherance of the trade or business of the lessee, but merely with a view to the yearly value or income from the land* by being leased or used for dwellings."

If the evidence had sustained the allegation in Smith's answer, that "the buildings were placed on said lot in connection with said hotel and the business thereof, and for the purpose of extending and carrying on said business," then the case would have been on all fours with *Ombony* v. *Jones*,

19 N. Y., with two exceptions. In the first place, in *Ombony* v. *Jones*, the tenant erected the building in dispute on the same lot on which the tavern was situated, and, therefore, held it under the same title ; here, the buildings are erected on a different lot from the hotel lot, and were held under independent title. In the second place, the tenant in that case was for years, and in this case, for life. I am not prepared to say, that the first distinction would make any difference in the application of the rule. But I think the other would. At any rate, there is enough distinction between the two cases to justify a departure from that precedent, even if the evidence had fully sustained the answer, especially as that case goes to the verge of the law, if not a little beyond it.

My conclusions are :—

1. That the general rule is, that everything affixed to the freehold, passes with the freehold, and that the rigor of this rule is only relaxed in exceptional cases.

2. That this general rule will prevail even between landlord and tenant for years, unless the circumstances are such as to create an exception.

3. That an exception does exist, in favor of tenant for years, in the case of buildings erected principally for the purpose of trade, or in the nature of trade, or outbuildings not attached to the soil.

4. That no exception exists, in favor of such tenants, where the buildings are erected for use principally as dwelling houses, or with a view of adding to the yearly income.

5. That it is doubtful how far a tenant for life is entitled to the exceptions in favor of tenant for years, but it is certain that the rule of exception as to him is of more "limited range."

6. That the decisions, especially of late years, lay little stress upon the mode of attachment to the soil, and more upon the relations of the parties, the intention with which the buildings are erected, and the uses to which they are put. See, now, *McDavid* v. *Wood*, 5 Heisk. 95.

7. That those who claim under the tenant for life in this case, fail to bring themselves within any of the exceptions recognized by the authorities.

8. And, therefore, that the petitioners are entitled to the buildings in dispute as part of the freehold.

Decree accordingly, but, under the circumstances, the petitioners will be charged with all the costs of their proceedings.